## IN THE UNITED STATES DISTRICT
## FOR THE DISTRICT OF COLUMBIA

POBLETE TAMARGO LLP
COURTHOUSE SQUARE
510 King Street, Suite 350
Alexandria, Virginia 22314

      *Plaintiff,*

      v.

U.S. DEPARTMENT OF STATE
2201 C Street, N.W.
Washington, D.C. 20520

      *Defendant.*

Civil Action

Case No.

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF TO COMPEL COMPLIANCE WITH THE FREEDOM OF INFORMATION ACT

Plaintiff Poblete Tamargo LLP ("Poblete Tamargo"), through counsel, brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et. seq.*, challenging the failure of the United States Department of State ("Defendant DOS"), to respond to the Plaintiff's request within the statutorily prescribed time period and seeking the disclosure and release of agency records improperly withheld by Defendant. In support thereof, Plaintiff alleges:

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties under 5 U.S.C. § 552 (a)(4)(B), 28 U.S.C. § 1331 because this action arises under Freedom of Information Act ("FOIA"), the Administrative Procedures Act ("APA"), and the Declaratory Judgement Act ("DJA"), 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

1

2.   Venue lies in the District of Columbia and in this Court under 5 U.S.C. § 552(a)(4)(B); 28 U.S.C. §§ 1391(b)(2) and 1391(e).

3.   Declaratory relief is appropriate under 28 U.S.C. § 2201.

4.   Injunctive relief is appropriate under 28 U.S.C. § 2202 and 5 U.S.C. 552(a)(4)(B).

## PARTIES

5.   Plaintiff, with offices at Courthouse Square, 510 King Street, Suite 350, Alexandria, Virginia 22314, is a law firm representing over two dozen American families and other U.S. persons holding U.S. certified claims[1] against the government of Cuba.

6.   The Defendant is an Executive Branch agency of the United States Government within the meaning of 5 U.S.C. § 552(f)(1) located at 2201 C Street, N.W., Washington, D.C. 20520. Defendant is in control and possession of the records sought by the Plaintiff.

## STATUTORY BACKGROUND

7.   The Congress enacted FOIA to introduce transparency to government activities. FOIA imposes on federal agencies a duty to provide a requester all non-exempt information that is reasonably segregable.

8.   To accomplish FOIA goals, the law establishes the public's right to access all federal agency records upon request unless records may be withheld under one of nine, narrowly construed FOIA exemptions. 5 U.S.C § 552(b)(1)-(9). FOIA imposes strict and

---

[1] The phrase "U.S. certified claims" or "claims" in this complaint refers to claims by nationals of the United States against the Government of Cuba which were certified by the United States Foreign Claims Settlement Commission at the Department of Justice under the Title V of the International Settlement Claims Act of 1949 (as amended), 22 U.S.C. §§ 1643, 1623. One of several ways a claim holder can secure a payment on a certified claim includes, but is not limited to, a bilateral settlement agreement between the United States and the Republic of Cuba whereby Cuba agrees to settle the claims. See https://www.justice.gov/fcsc/claims-against-cuba (*last accessed July 11, 2018*).

rigorous deadlines on federal agencies when they receive a request for records. Agency officials must determine in good faith whether the agency possesses responsive records and whether to disclose responsive records and notify the requester of its determination within 20 working days of receiving a FOIA request.

9. FOIA requires federal agencies to disclose records, *see id.* § 552, and mandates a policy of broad disclosure of government records. An inquiry under FOIA brings with it a strong presumption for disclosure and the agency must make reasonable efforts to search for records in a matter reasonably calculated to locate all records responsive to the FOIA request. *Id.* § 552(a)(3)(C)-(D).

10. Any reasonably segregable responsive information must be released promptly unless agency officials can establish certain unusual circumstances are present and / or that it may lawfully withhold records, or portions thereof, from disclosure. *Id.* § 552(a)(3)(A), (a)(6). Within 20 working days, the agency must respond and inform the requester it may appeal the agency's determination. *Id.* § 552(a)(6)(A)(i). FOIA places the burden on the agency to prove that it may withhold responsive records from the requester. *Id.* § 552(a)(4)(B)

11. Congress has specified the limited circumstances in which federal agencies may obtain more time to make the determination required under 5 U.S.C. § 552(a)(6)(A)(i). First, an agency may toll the 20-working-day deadline to seek addition information or clarification from the requester, but that tolling period ends when the agency receives the additional information or clarification. *Id.* § 552(a)(6)(A)(ii).

12. Second, an agency may extend the 20-working-day deadline for an additional 10 working days by giving a written notice to the requester that sets out "unusual

circumstances" to justify a deadline extension which also requires that it provide the date by which the agency expect to make the determination. *Id.* § 552(a)(6)(B)(i). However, to invoke "unusual circumstances," the agency must provide the requester with "an opportunity to limit the scope of the request so that it make be processed within [20 working days] or an opportunity to arrange with the agency an alternative time for processing the request or a modified request." *Id.* § 552(a)(6)(B)(ii).

13. Additionally, when asserting "unusual circumstances," the agency "shall make available its FOIA Public Liaison" to "assist in the resolution of any disputes between the requester and the agency." *Id.*

14. Congress recognized in certain, limited instances, records may be exempt from FOIA's broad disclosure mandate, and created nine categories of exemptions. *Id.* § 552(b). These exemptions, however, are narrowly construed in light of FOIA's objective of disclosure and transparency, not secrecy. The U.S. District Courts have jurisdiction to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *Id.* § 552(a)(4)(B).

15. An agency's response to a FOIA request or a FOIA appeal is subject to judicial review under the Administrative Procedures Act ("APA"), which confers a right of judicial review on any person hurt by agency action, 5 U.S.C. § 702, and authorizes District Courts to compel agency action found to be "arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with law." *Id.* § 706(2)(A).

16. Neither this suit, nor the underlying FOIA request challenges the importance of safeguarding national security or interfere in any "weighty concerns of foreign policy," Regan v. Wald, 468 U.S. 222, 242, 104 S. Ct. 3026, 3038 (1984). While questions on foreign

4

policy matters are "delicate, complex, and involve large elements of prophecy," <u>Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.</u>, 333 U.S. 103, 111 (1948) they are usually left to the political branches of government, not the courts. However, FOIA is not a license for agencies to arbitrarily conceal information from responsible stakeholders in the political process, such as the holders of U.S. certified claims against Cuba. FOIA mandates a "strong presumption in favor of disclosure." <u>Multi AG Media LLC v. Dep't of Agric.</u>, 380 U.S. App. D.C. 1, 4 (2008).

## FACTUAL BACKGROUND

### *The Cuban Liberty and Democratic Solidarity Act of 1996 & International Claims Act of 1949*

17. Before outlining the numerous violations by the Defendant Department of State, ("Defendant DOS") of FOIA laws and regulations, a brief overview of U.S. / Cuba policy and statutory history that led to the Plaintiff's FOIA submissions – one request made over four years ago, the other request approximately three years ago – may assist this court as it considers the Plaintiff's requests for relief.

18. The United States maintains a comprehensive economic embargo on Cuba implemented in the 1960s in response to Cuba's refusal to compensate American citizens for property confiscations. The embargo and policy was updated several times in the 1990s and the 2000s, in part, to protect the property rights of American citizens possessing U.S. certified claims.

19. Ever since governments of the United States and Cuba re-established diplomatic relations during the Obama administration on July 20, 2015, persons subject to U.S. law, including at least one major American hotel corporation, based upon information and belief to be the holder of a U.S. certified claim, has been authorized by the U.S. government to

5

engage in transactions in Cuba, while other holders of U.S. certified claims have been barred
by the U.S. government from engaging in potentially comparable transactions involving
certified claims.

20. The Plaintiff's FOIA request seeks the release of records related to the
government's efforts under the Cuban Liberty and Democratic Solidarity Act of 1996
("Helms-Burton" or "Act"), Pub.L. 104–114, 110 Stat. 785, 22 U.S.C. §§ 6021–6091 (Mar.
12, 1996) and the International Claims Settlement Act of 1949 ("the Claims Act"), P.L. 90-
421, 80 Stat. 656, 22 U.S.C. §§ 1621–1627; the Trading with the Enemy Act of 1917, 40
Stat. 411, 12 U.S.C. §§ 95a–95b and 50 U.S.C. App. §§ 1–44; and the Cuban Assets Control
Regulations, 31 C.F.R. 515, *et. seq.* ("the Regulations"); and other laws and regulations
related to the settlement of outstanding certified claims against the government of Cuba.

21. The Cuban Liberty and Democratic Solidarity Act of 1996, also known as the
Helms-Burton law, was signed into law by President Bill Clinton on March 12, 1996. Helms-
Burton expanded the statutory bases for U.S. economic sanctions on Cuba in order to, among
other things, "protect United States nationals against confiscatory takings and the wrongful
trafficking in property confiscated by the Castro regime." 22 U.S.C. § 6022 (6). The Helms-
Burton law complements the Cuban Democracy Act of 1992, 22 U.S.C. ch. 69 § 6001 et seq.,
a law that created an exception to the embargo and allowed persons subject to U.S. to provide
telecommunications services in Cuba.

22. Under Title I and Title V of the International Claims Settlement Act of 1949, 22
U.S. §§ 1623, 1643, 5,913 certified claims are held by American citizens and were
"certified" by the United States Foreign Claims Settlement Commission at the Department of

Justice ("Commission"). Upon information and belief, U.S. certified claims against Cuba are valued at approximately $8 billion.[2]

23. The International Claims Settlement Act, the Cuban Democracy Act, the Helms-Burton law, the Regulations, other laws, regulations, Executive Orders and executive proclamations, provide certified claim holders legal and policy tools to protect and defend their rights including the ability to sue in U.S. federal court persons who are unlawfully trafficking in property in Cuba that is the subject of a certified claim ("Title III litigation"). 22 U.S.C. §§ 6081-6085.

24. Under a Presidential waiver, however, the effective date of the litigation option under Title III of Helms-Burton, discussed in paragraph 23, has been suspended every six months since Helms-Burton was enacted on March 12, 1996, and certified claim holders have been effectively barred from bringing lawsuits against traffickers in properties in Cuba that are the subject of a U.S. certified claim. 22 U.S.C. § 6085. The presidential waiver of Title III has been used over forty times.

25. Despite this significant obstacle limiting a certified claim holder's ability to defend their property and other rights in federal courts, there are several other ways, albeit limited, for claim holders to protect and defend their property rights and other interests.

26. For example, U.S. certified claim holders can request that the Defendant DOS review potential trafficking by foreign nationals, and other persons subject to U.S. law, who engage in any transactions in Cuba on properties that are the subject of a certified claim.

---

[2] Certified claims against Cuba are different from the potential and indeterminate number of non-certified claims, or otherwise potential claims, that may be held by American citizens and non-U.S. persons around the world against the government of Cuba for similar uncompensated confiscations, takings, and expropriations. The subject FOIA request only requested information related to certified claims against Cuba.

Upon learning of potential trafficking on properties in Cuba which are the subject of a certified claim, under Title IV of *Helms-Burton,* senior officials of foreign corporations found to be trafficking in confiscated property by the Defendant DOS, "shall" be denied a visa to enter the United States. 22 U.S.C. § 6091. Indeed, Title IV of Helms-Burton is an important deterrent to trafficking in property that is the subject of a certified or other potential claim. It signals to persons subject to U.S. law they should be mindful how transactions are structured with Cuba and to avoid properties subject to certified claims.

27. Helms-Burton also includes a statutory transition roadmap, a set of conditions that must be met before economic sanctions on Cuba can be eased.

28. For example, the President must certify to the U.S. Congress, upon the finding of a transition government in Cuba, that Cuba is "taking appropriate steps" to return confiscated properties, or compensate victims of uncompensated property confiscations. 22 U.S.C. § 6065 (b)(2)(D). While these administrative and other legal tools are limited in scope, they are important ways in which a U.S. certified claim holder can protect property and other rights.

29. Helms-Burton Title IV actions, combined with policy and other efforts, have resulted in agreements, authorized by the U.S. government, between certified claim holders and traffickers in property in Cuba subject to a U.S. certified claim.

30. In 1997, public information indicates that an Italian telecommunications company, the Società Finanziaria Telefonica S.p.A. ("STET") contracted with a U.S. certified claim holder, the International Telephone and Telegraph Corporation ("ITT"). This agreement had an estimate value of approximately $30,000,000, which STET paid to ITT. This arrangement allowed STET to provide telecommunications services in Cuba by using for ten years the property in Cuba which is subject to a certified claim held by ITT.

***The U.S. Government is Picking Winners & Losers, Potentially Violating
Legal and Constitutional Rights of Holders of U.S. Certified Claims***

31. On December 17, 2014, President Barack Obama announced he intended to re-establish diplomatic relations between the United States and Cuba.

32. To defend and protect their rights, U.S. certified claim holders need access to more information about the process used by the Obama Administration to re-establish diplomatic relations with Cuba, including information required by law to be sent to the Congress annually under Helms-Burton including Section 108 which states the "[p]resident shall submit a report to the appropriate congressional committees on commerce with, and assistance to, Cuba from other foreign countries during the preceding 12-month period."

33. Following several months of negotiations, on July 20, 2015 the U.S. and Cuba renewed diplomatic relations after 54 years when President John F. Kennedy closed the U.S. Embassy in Havana in response to the largest-ever ideologically motivated, and uncompensated, confiscation of U.S. property by a foreign nation.

34. Based information and belief, on or about August 14, 2015, Secretary of State John Kerry traveled to Havana, Cuba to re-designate the U.S. Interests Section in Havana as the U.S. Embassy. On or about September 11, 2015, the United States and Cuba held a meeting in Havana, Cuba, during which officials from both governments allegedly set a preliminary timeline for talks on many issues including property claims.

35. Based on information and belief, the first government-to-government claims discussion was held in Havana, Cuba, on or about December 8, 2015, during which U.S. officials said "the United States views the resolution of outstanding claims as a top priority

for normalization."[3] American and Cuban officials reportedly met two more times to discuss the U.S. certified claims, on July 28, 2016, in Washington, D.C., and on January 12, 2017, in Havana, Cuba.

36. Based on information and belief, on or about March 18, 2016, Starwood Hotels & Resorts Worldwide, Inc. announced that the global hotel luxury hotel company had agreed with the government of Cuba to manage several hotels in Cuba.

37. Based on information and belief, these hotels are owned by companies owned or managed by the Cuban military and that Starwood opened the first of these locations, Four Points Havana, on July 7, 2016.

38. Based on information and belief, Starwood, and its successor company, Marriott Hotels, are holders of certified claim CU-2-001. Without including interest, CU-2-001 was certified by the Commission to be worth $50,703,926. [4] According to Vice President of the U.S. Chamber of Commerce the re-entry into Cuba of major U.S. brands such as Starwood went on to "shatter several myths" about doing business in Cuba including that "the decades-old U.S. embargo and unsettled certified claims would block their proposed investments on the island."[5]

---

[3] "US, Cuba to Hold First Claims Talks in Havana," Voice of America (Dec. 8, 2015), available at https://www.voanews.com/a/us-cuba-hold-first-claims-talks-in-havana/3093074.html (last accessed October 9, 2018).

[4] U.S. certified claim CU-2-001 accessible at the Foreign Claims Settlement Commission website, https://www.justice.gov/sites/default/files/pages/attachments/2014/10/23/cu-2-001.pdf (last accessed Oct. 9, 2018).

[5] "Starwood's Deal in Cuba Encourages Would-Be Investors," BNA: International Trade Daily, May 31, 2016; *available at* https://www.bna.com/starwoods-deal-cuba-n57982073271/ (last accessed July 15, 2018).

39. Plaintiff represents approximately two dozen American families and other U.S. Persons holding U.S. certified claims against the government of Cuba. A long-accepted principle of U.S. international claims law and customary international law is that U.S. persons are entitled to "prompt, adequate, and effective compensation," yet for many reasons that standard has not been followed in U.S. Certified Claims against Cuba cases. Plaintiff's FOIA request seeks to fill in the information gaps of U.S. efforts to secure compensation for U.S. certified claims holders, level the playing field, develop viable options for claim holders to resolve their claims and put traffickers in confiscated properties on notice.

### State Department FOIA Request (1 of 2)
### Case Control Number F-2014-06088

40. On April 8, 2014, Plaintiff submitted the first of two FOIA requests that are the subject of this Complaint. A copy of the Plaintiff's FOIA letter dated April 8, 2014, is attached as Exhibit A and incorporated herein. Over four years later, the Defendant has not produced a single document from this FOIA request.

41. In the April 8, 2014, FOIA request, the Plaintiff stressed a new Cuba investment law in could result in the unlawful trafficking on real and other property subject of a certified U.S. claim, hence the Plaintiff's "compelling need," 22 C.F.R. § 171.12(b) for the information. There was an added urgency at the time because, according to news reports, President Obama's advisors were engaging in direct talks with Cuban officials and, as the Plaintiff would learn a few years later, the talks included claims.

42. In a letter dated April 17, 2014, Exhibit B, Defendant DOS acknowledged receipt of the Plaintiff's FOIA request stating "[u]nusual circumstances (including the number and location of Department components involved in responding to your request, the volume of

11

requested records, etc.) may arise that would require additional time to process your request"
and was assigned Case Control Number F-2014-06088.

43. Defendant DOS denied the Plaintiff's request for expedited consideration and, in
an initial subsequent communication advised the Plaintiff of an estimated completion date of
May 30, 2016.

44. On June 4, 2015, Plaintiff contacted Defendant DOS, via email, to check the status
of the FOIA April 8, 2014 request. Four days later, Defendant DOS responded via email that
the Plaintiff's request had been forwarded to a case analyst. On June 9, 2015, Defendant
DOS told the Plaintiff a request for a status update had been made on the Plaintiff's behalf
with the Compliance and Research Branch.

45. On March 23, 2016, FOIA Requester Service Center, responding for Defendant
DOS, contacted Plaintiff via email advising the estimated completion date for the case was
May 30, 2016, stating in their response that estimated completion dates "are subject to
change and are "strictly" estimates and not intended to be "actual" dates of completion, due
to various extenuating factors, which are beyond the control of the Branch, which might
include coordination with other Agencies during the process (referrals, concurrences, etc.).
Interim release dates are provided, as applicable."

46. On March 23, 2016, the Plaintiff responded via email that the case has been open
since April 2014 and asked for an update on why the request for information was taking so
long. The FOIA Requester Service Center, for Defendant DOS, responded via email on
March 24, 2016, that "[g]iven the high volume of FOIA requests, in addition to a backlog
which the Department is working diligently to reduce, there is presently a delay in the
completion of FOIA requests."

47. On October 26, 2017, Plaintiff contacted Defendant DOS via email asking for a status update on the April 8, 2014 FOIA and received "Automatic Reply" that FOIA Case Officer would be out of the office until October 30 and to forward email to a "FOIA Surge" mailbox.

48. On October 26, 2017, Plaintiff forwarded the email to the Defendant at the "FOIA Surge" email address as stated in Automatic Reply but received a response that the message was undeliverable because the group is restricted to authenticated senders. On the same day, Plaintiff also forwarded the email to Defendant at "FOIA Status" email address asking for an update regarding the April 8, 2014 FOIA request.

49. On October 27, 2017, Defendant DOS responded that the request is "pending processing in the Statutory Compliance and Research Branch. Please note that the Department processes FOIA and Privacy Act requests on a first-in, first-out basis, and currently has a backlog of approximately 12,800 cases. As a result, there could be delays in processing your request." Defendant DOS also stated that they would update the estimated date of completion though it could take until September 2019 to complete processing.

50. On March 14, 2018, Defendant contacted Plaintiff via telephone and email and said the Case Manager requires additional information to expedite the FOIA request. On March 19, 2018, Plaintiff asked Defendant DOS via email if partial responses to the April 8, 2014, FOIA request could be provided, and additional information provided as the request for records is completed.

51. On March 19, 2018, Plaintiff was advised by Defendant DOS that even if the initial request was modified to allow for the release of some of the information requested over four years ago, "[d]ue to the expected volume of information/documentation required to

13

provide" a modified response "[a] great deal of additional research time" would still be needed to complete Plaintiff's modified request for information.

52. Notwithstanding the Defendant's assurance that the processing of Plaintiff's request would be forthcoming, to date the Defendant has disclosed no records in response to the Plaintiff's April 8, 2014 FOIA request, nor has Defendant DOS stated which records it intends to disclose.

### State Department FOIA Request (2 of 2)
### (Case Control Number F-2015-15752)

53. Besides FOIA Case Control Number F-2014-06088, *supra*, the Plaintiff submitted a second FOIA request by letter dated October 20, 2015. A copy of the Plaintiff's FOIA request by letter dated October 20, 2015, is attached as Exhibit C and incorporated herein. Soon it will be three years since this request was made and not a single document has been provided to the Plaintiffs.

54. In an almost identical response to Case Control Number F-2014-06088, Exhibit B, by letter dated November 16, 2015, Exhibit D, Defendant DOS acknowledged receipt of the Plaintiff's October 20, 2015 FOIA request stating "[u]nusual circumstances (including the number and location of Department components involved in responding to your request, the volume of requested records, etc.) may arise that would require additional time to process your request" and was assigned Case Control Number F-2015-15752.

55. As the Plaintiff did with the April 8, 2014 FOIA request Case Control Number F-2014-06088, the Plaintiff explained the reasons the Plaintiff was requesting expedited consideration for October 20, 2015 FOIA request, including that Plaintiff's clients' Constitutional and other rights under U.S. law may result; however, the Defendant DOS

denied the Plaintiff's request for expedited consideration because the Plaintiff did not "meet any of the established criteria" for expedited considering under 22 C.FR. § 171.12(b).

56. On July 10, 2018, the Plaintiff requested an update from Defendant DOS regarding the October 20, 2015 FOIA request. On July 11, 2018, Defendant DOS responded that Plaintiff's "FOIA request is pending processing" and provided no expected completion date.

### *Exhaustion of Administrative Remedies*

57. Through Defendant DOS's denial of Poblete Tamargo LLP's request for expedition of the FOIA April 8, 2014 and the October 20, 2015 FOIA requests, Poblete Tamargo LLP has exhausted its administrative remedies and seeks immediate judicial review.

## CAUSES OF ACTION

## COUNT ONE

### *Violation of the FOIA for Failure to Timely Respond to Plaintiff's State Department FOIA Requests F-2014-06088 and F-2015-15752*

58. The Plaintiff re-alleges and incorporates by reference the allegations made in the preceding paragraphs.

59. Defendant DOS's failure to timely respond to Plaintiff's April 8, 2014 and October 20, 2015 requests violates FOIA, 5 U.S.C. § 552 (a)(6)(A)(i), and Defendant DOS's regulations promulgated, 28 C.F.R. §16.6(b).

60. Based on the Plaintiff's ethical obligations to its clients, Plaintiff will undoubtedly continue to employ FOIA provisions in record requests for the foreseeable future to the Defendant DOS.

61. Unless enjoined and made subject to a declaration of the Plaintiff's legal rights by this Court, the Defendant DOS will continue to egregiously violate the Plaintiff's rights to receive public records under FOIA.

## COUNT TWO

### *Violation of the FOIA for Failure to Expedite the Processing of Plaintiff's Request Responsive to F-2014-06088 and F-2015-15752*

62. Plaintiff re-alleges and incorporates by reference the allegations made in the preceding paragraphs.

63. Defendant DOS's failure to expedite the processing of Plaintiff's request violates 5 U.S.C. § 552(a)(6)(E)(iii), and Defendant DOS's own regulations promulgated, 28 C.F.R. § 16.5(d).

64. Unless enjoined and made subject to a declaration of the Plaintiff's legal rights by this Court, the Defendant DOS will continue to egregiously violate the Plaintiff's rights to receive public records under FOIA.

## COUNT THREE

### *The State Department Has Failed to Conduct an Adequate Search for All Records Responsive State Department F-2014-06088 and F-2015-15752*

65. Plaintiff re-alleges and incorporates by reference the allegations made in the preceding paragraphs.

66. The Plaintiff has a statutory right to have the Defendant DOS process its FOIA requests so it complies with FOIA. 5 U.S.C. § 552(a)(3). The Defendant DOS violated the Plaintiff's rights when it unlawfully failed to undertake a search reasonably calculated to locate all records responsive to FOIA Case Control Numbers F-2014-06088 and F-2015-15752.

67. Based on the Plaintiff's obligations to its clients, it will continue to employ FOIA provisions in record requests to the Defendant DOS in the foreseeable future.

68. Unless enjoined and made subject to a declaration of the Plaintiff's legal rights by this Court, the Defendant DOS will continue to egregiously violate the Plaintiff's rights, and that of its clients, to receive records under FOIA.

## COUNT FOUR

### *State Department Failed to Provide all Reasonably Segregable Portions of Any Lawfully Exempt Records to F-2014-06088 and F-2015-15752*

69. Plaintiff re-alleges and incorporates by reference the allegations made in the preceding paragraphs.

70. The Plaintiff has a statutory right to any reasonably segregable portion of a record that contains information subject to the FOIA exemptions. 5 U.S.C. § 552(b).

71. The Defendant DOS egregiously violated the Plaintiff's rights by unlawfully withholding reasonably segregable portion so many lawfully exempt records responsive to FOIA Case Control Numbers F-2014-06088 and F-2015-15752.

72. Based on the Plaintiff's ethical obligations to its Clients it will undoubtedly continue to employ FOIA provisions in record requests for the foreseeable future to the Defendant DOS.

73. Unless enjoined and made subject to a declaration of the Plaintiff's legal rights by this Court, the Defendant DOS will continue to egregiously violate the Plaintiff's rights to receive public records under FOIA.

## COUNT FIVE

### *The State Department Withheld or Unreasonably Delayed Actions Required Under FOIA*

74. Plaintiff re-alleges and incorporates by reference the allegations made in the preceding paragraphs.

75. The Defendant DOS unlawfully withheld agency action by violating mandates of FOIA consequent to its failure and refusal to (1) search for and disclose records responsive to F-2014-06088 and F-2015-15752; (2) make a timely and lawful determination on F-2014-06088 and F-2015-15752; (3) conduct a search reasonably calculated to locate all responsive records on F-2014-06088 and F-2015-15752; (4) provide the Plaintiff with records responsive to F-2014-06088 and F-2015-15752; and (5) provide the Plaintiff with all reasonably segregable portions of records to F-2014-06088 and F-2015-15752 in the events that records may be subject to an exemption. The Defendant DOS's failure constitutes egregious agency actions unlawfully withheld, and therefore, these actions are actionable under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706 (1).

76. The Defendant DOS unlawfully withheld agency action by violating mandates of FOIA consequent to its failure and refusal to (1) search for and disclose records responsive to F-2014-06088 and F-2015-15752; (2) make a timely and lawful determination on F-2014-06088 and F-2015-15752; (3) conduct a search reasonably calculated to locate all responsive records on F-2014-06088 and F-2015-15752; (4) provide the Plaintiff with records responsive to F-2014-06088 and F-2015-15752; and (5) provide the Plaintiff with all reasonably segregable portions of records to F-2014-06088 and F-2015-15752 in the events that records may be subject to an exemption. The Defendant DOS's failure constitutes

egregious agency action that has created unreasonably delays and are therefore actionable under Administrative Procedures Act ("APA"), 5 U.S.C. § 706(1).

77. As alleged in the preceding paragraphs, the Defendant DOS's failure to comply with the mandates of FOIA has injured the Plaintiff's ability to effectively represent its Clients and violates its statutory duties under the APA.

78. The Plaintiff has suffered a legal wrong because of the Defendant DOS's failure to comply with the mandates of FOIA. As alleged above, the Defendant DOS has violated its statutory duties under the APA and injured the Plaintiff's ability to effectively represent their Clients.

79. The Plaintiff has no other adequate remedy at law to redress the violations noted.

80. Plaintiff may have judicial review under APA, 5 U.S.C. § 702.

## PRAYER OF RELIEF

WHEREFORE, Plaintiffs pray this Court:

A.  Enter an order requiring the Defendant to conduct searches for any records responsive to Plaintiff's FOIA requests using search methods reasonably likely to lead to the discovery of all responsive records;

B.  Enter an order requiring the Defendant to produce, by a date certain, any non-exempt responsive records and a *Vaughn* index of any response records withheld under a claim of exemption;

C.  Enter an order enjoining the Defendants from continuing to withhold any non-exempt responsible records;

D.  Enter an order requiring the Defendants to grant Plaintiff's request for a fee waiver;

E.  Award the Plaintiff its costs, reasonable attorneys' fees, and other disbursements for this action; and,

F.  Grant such other relief as this Court deems appropriate.

Dated: October 10, 2018

Respectfully Submitted,


Jason Ian Poblete (D.C. Bar No. 500414)
PobleteTamargo LLP
510 King Street, Suite 350
Alexandria, Virginia 22314
Phone: 703.566.3037
Fax: 703.566.3972
jpoblete@pobletetamargo.com

*Counsel for Plaintiff*